# Exhibit B

# ADMINISTRATIVE SERVICES AGREEMENT

This Administrative Services Agreement ("Agreement") between United HealthCare Insurance Company ("Our," "Us," or "We" in this Agreement) and Cintas Corporation ("You" or "Your" in this Agreement) is effective January 1, 2003 ("Effective Date"). This Agreement covers the services we are providing to you for use with your self-funded employee benefit plan.

This Agreement is structured so that the General Provisions appear first and the related Exhibits follow. The Agreement consists of this page, the main body following this page, and the Exhibits.

United HealthCare Insurance Company identifies this arrangement as Contract No.: 702497.

By signing below, each party agrees to the terms of this Agreement.

**United HealthCare Insurance Company**
450 Columbus Blvd.
Hartford, CT 06115-0450

**Cintas Corporation**
6800 Cintas Boulevard
Cincinnati, Ohio 45262

By _____
       Authorized Signature

Print Name _____Holly Durinick_____

Print Title _____Contract Acct. Exec._____

Date _____4/02/03_____

By _____
       Authorized Signature

Print Name _____LARRY FULTZ_____

Print Title _____VP, HUMAN RESOURCES_____

Date _____3-28-03_____

ASA98 (4/01)

# Table of Contents

Section 1  -  Definitions ................................................................................ 2

Section 2  -  Employee Benefit Plan ................................................................ 3

Section 3  -  Records, Information, Audits ...................................................... 3

Section 4  -  Indemnification .......................................................................... 4

Section 5  -  Plan Benefits Litigation .............................................................. 5

Section 6  -  Taxes And Assessments ............................................................. 5

Section 7  -  Your Other Responsibilities ....................................................... 5

Section 8  -  Service Fees .............................................................................. 6

Section 9  -  Term Of The Agreement ............................................................ 7

Section 10  -  Termination Of The Agreement ................................................ 7

Section 11  -  Mediation ................................................................................. 7

Section 12  -  Services Provisions .................................................................. 8

Section 13  -  Miscellaneous .......................................................................... 15

Section 14  -  Systems Access ....................................................................... 15

EXHIBIT A  -  SERVICE FEES ....................................................................... 17

EXHIBIT B  -  PERFORMANCE STANDARDS FOR HEALTH BENEFITS .............. 19

EXHIBIT C  -  PERFORMANCE GUARANTEE FOR PROVIDER DISCOUNTS .......... 24

EXHIBIT D  -  THIRD PARTY DISCLOSURE AGREEMENT ................................ 27

## Section 1  -  Definitions

When these terms are used in the Agreement they have the meanings shown. The words may or may not be capitalized and may be singular or plural.

**Affiliated Employer:**  An entity that is affiliated with you and whose employees or former employees are covered by the Plan. This term is more specifically defined in Section 2.6.

**Agreement Period:**  Period of twelve (12) months commencing on the Effective Date and automatically continuing for additional 12-month periods until the Agreement is terminated. The parties intend that this agreement will continue in force for at least four years, consistent with the service fee guarantee contained in Exhibit A and subject to the right to terminate pursuant to Section 10.

**Bank:**  Chase Bank, New York, New York.

**Bank Account:**  Bank Account maintained for the payment of Plan benefits, expenses, and fees.

**Confidential Participant Information:**  Information that contains personally identifiable health information about a Participant.

**Employee:**  A current or former employee of you or an Affiliated Employer.

**ERISA:**  Employee Retirement Income Security Act of 1974 as amended from time to time.

**Managed Care Network:**  Network of Network Providers who have entered into or are governed by contractual arrangements under which they agree to provide health care services to Participants and accept negotiated fees for these services.

**Network Provider:**  Health care provider who participates in one of our Managed Care Networks.

**Overpayments:**  Payments that exceed the amount payable under the Plan (for example, because of a provider billing error, retroactive or inaccurate eligibility information, coordination of benefits, Medicare disputes, or missing information), and other overcharges made by providers, including hospitals discovered during the course of a hospital bill audit.

**Participant:**  Employee or dependent who is covered by the Plan.

**Plan:**  The ERISA Plan to which this Agreement applies, but only with respect to those provisions of the Plan relating to the self-funded health benefits we are administering, as described in the Summary Plan Description.

**Plan Administrator:**  "Administrator" or "Plan Administrator" as these terms are defined under ERISA and shall refer to the current or succeeding person, committee, partnership, or other entity designated as such by the terms of the instrument under which the Plan is operated, or by law.

**Proprietary Business Information:**  Information about your business or our business that is confidential, proprietary, trade secret or is not readily available to the general public; or, information that has been designated by you or us as confidential or proprietary.

**Self-Fund or Self-Funded:**  Means that you have the sole responsibility to pay, and provide funds, for all Plan benefits. We have no liability to provide these funds. This is true even if we provide stop loss insurance to you.

**Summary Plan Description:**  Document(s) provided to Participants describing the terms and conditions of coverage offered under the Plan.

**Systems:**  Means our systems that we make available to you to facilitate the transfer of information in connection with this Agreement.

**Tax or Taxes:**  Taxes, assessments and all other federal, state, local or other governmental charges.

2

## Section 2  -  Employee Benefit Plan

**Section 2.1  The Plan.**  The Plan to which this Agreement applies is the Cintas Corporation Welfare Benefit Plan.

**Section 2.2  Responsibility for the Plan.**  Except to the extent this Agreement specifically requires us to have the fiduciary responsibility for a Plan administrative function, you accept total responsibility for the Plan for purposes of this Agreement including its benefit design and compliance with any laws that apply to you or the Plan, whether or not you or someone you designate is the Plan Administrator. We are not the Plan Administrator of the Plan.

**Section 2.3  Description of the Plan.**  You will give us a written description of the Plan benefits and Plan provisions in a timely manner, so that we will be able to provide our services under this Agreement on the Effective Date.

**Section 2.4  Plan Consistent with the Agreement.**  You represent that Plan documents, including the Summary Plan Description, are consistent with this Agreement. You will provide us with copies of Plan documents and employee communications prior to distributing these materials to employees or third parties. We will notify you if we determine that references to us are not acceptable, or any Plan provision is not consistent with this Agreement or the services that we are providing, and you will determine how to correct any inconsistencies.

**Section 2.5  Plan Changes.**  You will notify us in writing if you change the Plan's benefits or other relevant Plan provisions, including termination of the Plan, within a reasonable period of time prior to the change becoming effective. We can decide whether or not we will continue providing our services as a result of those changes. We have the option of giving you one hundred twenty (120) days written notice of termination of this Agreement following our receipt of your notice of the change. If we decide to continue providing our services, you will pay us for any reasonable costs that we incur, to put the Plan changes in place upon prior notice of these costs. In addition, the fees you are required to pay under this Agreement may be changed by us in accordance with Section 8 of this Agreement.

**Section 2.6  Affiliated Employers.**  You will provide us with a list of your Affiliated Employers prior to the Effective Date. You will provide written notice of any changes to this list prior to the time any new Employees of these Affiliated Employers will be added to the Plan. You represent that together you and the Affiliated Employers make up a single "control group" as defined by ERISA.

## Section 3  -  Records, Information, Audits

**Section 3.1  Records.**  We will keep records relating to the services we provide under this Agreement for as long as we are required to do so by law.

**Section 3.2  Access to Information.**  If you need information, for an audit or otherwise, that we have in our possession in order to administer the Plan, we will give you access to that information, if legally permissible, as long as the information relates to our services under this Agreement, and you give us (60) sixty days prior notice of the need for the information.

You must also represent that you have a reasonable procedure in place for handling Confidential Participant Information as required by any then current law.

We will provide information only while this Agreement is in effect and for a period of six (6) months after the Agreement terminates, unless you demonstrate that the information is required by law for Plan purposes.

We will also provide reasonable access to information to an entity providing services to you, such as an auditor or other consultant, if you request it. Before we will give access to Confidential Participant Information to that entity, that entity must sign our "Third Party Disclosure Agreement", a specimen of which is attached to this Agreement as Exhibit C.

**Section 3.3  Audits.**  During the term of the Agreement, and at any time within six (6) months following its termination, you or a mutually agreeable entity may audit us to determine whether we are fulfilling the terms of this Agreement. You must advise us at least sixty (60) days in advance of your intent to audit. The place, time, type, duration, and frequency of all audits must be reasonable and agreed to by us. All audits shall be limited to information relating to the calendar year in which the audit is conducted and/or the immediately preceding calendar year. With respect to our transaction processing services, the audit scope and methodology shall be consistent with generally acceptable auditing standards, including a statistically valid random sample or other acceptable audit technique as approved by us ("Scope").

You will pay any expenses that you incur, and will be charged an additional fee, determined by us, for more than one audit every twelve (12) months, for any on-site audit visit that is not completed within five (5) business days, or for sample sizes exceeding the Scope set forth above. You will incur a per claim charge for samples in excess of the Scope; and a $1000 charge for each day an audit exceeds the five (5) day on-site review limit per year. The additional fees cover the additional resources, facility fees, and other incremental costs associated with an audit that exceeds the Scope. You will also pay any unanticipated expenses we incur and all expenses incurred by us on any audit initiated after this Agreement is discontinued.

You will provide us with a copy of any audit reports.

**Section 3.4  Confidential Participant and Proprietary Business Information.**  Proprietary Business Information and Confidential Participant Information will be used solely to administer the Plan or to perform under this Agreement. Confidential Participant Information and Proprietary Business Information will not be disclosed to any person or entity other than either party's employees, subcontractors, or representatives needing access to such information to administer the Plan or perform under this Agreement.

We or a related entity may use Confidential Participant Information for research, creating comparative databases, statistical analysis, or other studies. We will maintain the confidentiality of such information as it relates to any individual Participant, provider, or your business. The research, databases, analyses, and studies are considered by us to be Proprietary Business Information.

## Section 4 - Indemnification

**Section 4.1  You Indemnify Us.**  You will indemnify us and hold us harmless against any and all losses, liabilities, penalties, fines, costs, damages, and expenses, we incur, including reasonable attorneys' fees, except where there has been a finding of gross negligence or willful misconduct in the performance of our obligations under this Agreement or where there has been material breach of this Agreement by us, as determined by a court or other tribunal having jurisdiction of the matter.

**Section 4.2  We Indemnify You.**  We will indemnify you and hold you harmless against any and all losses, liabilities, penalties, fines, costs, damages, and expenses, that you incur, including reasonable attorneys' fees, which arise out of our gross negligence or willful misconduct in the performance of our obligations under this Agreement or our material breach of this Agreement, as determined by a court or other tribunal having jurisdiction of the matter.

4

## Section 5   -   Plan Benefits Litigation

**Section 5.1  Litigation Against Us.** If a demand is asserted or litigation or administrative proceedings are commenced by a Participant or health care provider against us, or against the Plan and us jointly, to recover Plan benefits, related to our duties under this Agreement ("Plan Benefits Litigation"), we will select and retain defense counsel to represent our interest that is reasonably acceptable to you. In actions asserted against both you and us, and provided no conflict of interest arises between the parties, we may agree to joint defense counsel. All legal fees and costs we incur in defense of the litigation will be paid by you, except as provided in Section 4.2. The failure to seek payment of our legal fees and costs does not relieve you of your obligation to indemnify us for other amounts as provided in Section 4.1. The failure to provide notice of Plan Benefits Litigation does not relieve you of your obligation to pay our legal fees and costs. Both parties will cooperate fully with each other in the defense of the Plan Benefits Litigation.

In all events, you are responsible for the full amount of any Plan benefits paid as a result of such litigation.

**Section 5.2  Litigation Against You.** If litigation or administrative proceedings are commenced against you and/or the Plan, you will select and retain counsel and you will be responsible for all legal fees and costs in connection with such litigation except as provided in Section 4.2. We will cooperate fully in the defense of litigation arising out of matters relating to this Agreement.

## Section 6   -   Taxes And Assessments

**Section 6.1  Payment of Taxes and Expenses.** You will reimburse us for Taxes that are assessed against us or that we are required to pay, now or in the future, relating to: (1) the Plan; (2) taxes relating to benefit payments under the Plan; (3) this Agreement; or (4) our fees or services under this Agreement (but not Taxes on our net income). We have the authority and discretion to determine whether any such Tax should be paid or disputed. We will act reasonably in making that determination. You will also reimburse us for a proportionate share of any cost or expense reasonably incurred by us relating to such Tax, including costs and reasonable attorneys' fees incurred in disputing such Tax, and any interest, fines, or penalties relating to such Tax.

**Section 6.2  Tax Reporting.** In the event that the reimbursement of any benefits to Participants in connection with this Agreement is subject to tax reporting requirements, you are responsible for complying with these requirements.

## Section 7   -   Your Other Responsibilities

**Section 7.1  Eligibility Information.** You will tell us which of your employees, their dependents and/or other persons are eligible to be Participants. This information must be accurate and provided to us in an agreed to format. You will notify us promptly of any changes.

We shall be entitled to rely on the most current information in our possession regarding eligibility of Participants in paying Plan benefits and providing other services under this Agreement. We shall not be required to make retroactive changes in regard to claims for Plan benefits incurred on dates more than 60 days before the date on which corrected information was provided to us.

**Section 7.2  Notices to Participants.** You will give Participants the information and documents they need to obtain benefits under the Plan within a reasonable period of time before coverage begins. In the event of this Agreement's discontinuance, you will notify all Participants of the discontinuance of the services we are providing under this Agreement.

**Section 7.3  Financial Information.** At our request, you will provide us with non-proprietary financial information about you not readily available in the public domain that we need to determine if you can meet your financial obligations under this Agreement. We agree to maintain the confidentiality of the information you provide us pursuant to this section.

## Section 8 - Service Fees

**Section 8.1  Service Fees.**  You will pay us fees for our services. The service fees listed in Exhibit A of this Agreement are effective for the Agreement Period shown in the Exhibit. In addition to the service fees specified in Exhibit A, you must also pay us any additional fee that is authorized by a provision elsewhere in this Agreement or is otherwise agreed to by the parties.

**Section 8.2  Changes in Service Fees.**  We can change the service fees: (1) on each Agreement Period anniversary; (2) any time there are changes made to this Agreement or the Plan, which affect the fees; (3) when there are changes in laws or regulations which affect the services we are providing, or will be required to provide, under this Agreement; or (4) if the number of employees covered by the Plan or any option of the Plan changes by ten percent (10%) or more (e.g., when Participants change from an indemnity plan to a plan with a network differential). Any new service fee which arises out of such change will be effective on the date those changes occur, even if that date is retroactive.

We shall, however, provide you with ninety (90) days prior written notice of the revised service fees for subsequent Agreement Periods, item (1) above. Service fee adjustments relating to an Agreement Period anniversary shall become effective on the later of the first day of the new Agreement Period or thirty (30) days after we provide you with written notice of the new fees We shall provide you with prior written notice of the revised service fees for changes in the fees relating to items (2), (3) or (4) above as soon as we know what the adjustments will be.

If you do not agree to the new service fees, you may terminate this Agreement upon thirty (30) days written notice after you receive written notice of the new fees. You must still pay any amounts due for the periods during which the Agreement is not terminated.

**Section 8.3  Due Dates, Payments, and Penalties.**  In some cases, we will bill you for the amounts that you owe or we estimate you owe us. In those cases, the amounts owed are due and payable on the Due Date shown on the bill. In other cases, we will provide you with statements in advance that you either complete and send to us or verify through an electronic acknowledgement. In those cases, the Due Date for these amounts is on the first day of each calendar month. If undisputed amounts owed are not paid within fifteen (15) days after their Due Date ("Grace Period"), you will pay us interest on the undisputed amounts at the interest rate that we charge to our self-funded customers. You agree to reimburse us for any costs that we incur to collect these amounts. You will notify us promptly of any disputed charges. You agree to promptly meet in good faith to resolve any service fee discrepancies. Our determination to provide you with a Grace Period is based on your financial condition as of the Effective Date as viewed by us, and your compliance with material financial obligations. In the event we determine, based on reasonable information and belief, that your financial condition has deteriorated, or you continue to fail to comply with material financial obligations set forth in this Agreement, we may remove the Grace Period upon notice to you and reserve the right to either charge interest on payments not received following the Due Date or terminate the Agreement if payments are not received by the Due Date.

**Section 8.4  Reconciliation.**  For each Agreement Period, we will reconcile the total amounts you paid with the total amounts you owed. If the reconciliation indicates that we owe you money, your next payment will be credited. If the reconciliation indicates that you owe us money, we will invoice you for the amount due. In those cases, the Due Date for these amounts is on the first day of the next calendar month. You will pay us within fortyfive (45) days after receiving notice of the amounts that you owe us. For payments made after this fortyfive (45) days period, you will pay us interest on these amounts at the interest rate that we charge our other self-funded customers.

If the Agreement is terminated, then we will pay you the amount owed within fortyfive (45) days after we perform a final reconciliation. If the final reconciliation indicates that you owe us money, you will pay us within fortyfive (45) days after receiving notice of the amount owed.

For payments you make after fortyfive (45) days of receiving notice of the amounts that you owe us, we will charge interest at the interest rate that we charge our other self-funded customers.

6

## Section 9  -  Term Of The Agreement

**Section 9.1  Services Begin.**  We will begin providing you services under this Agreement on the Effective Date. Our services apply only to claims for Plan benefits that are incurred on or after the Effective Date.

This Agreement will apply for an initial Agreement Period commencing on the Effective Date and will automatically continue for additional Agreement Periods, unless and until this Agreement is terminated.

**Section 9.2  Services End.**  Our services under this Agreement stop on the date this Agreement terminates, regardless of the date that claims are incurred. However, we may agree to continue providing certain services beyond the termination date.

## Section 10  -  Termination Of The Agreement

**Section 10.1  Termination Events.**  This Agreement will terminate when: (1) The Plan terminates. (2) Both parties agree to terminate the Agreement. (3) After the initial Agreement Period, either party gives the other party at least thirty (30) days prior written notice. (4) We give you notice of termination because you did not pay the fees or other amounts you owed us under this Agreement. (5) You fail to provide the required funds for payment of benefits. (6) Either party is in material breach of this Agreement, other than by non-payment or late payment by you of fees owed, and does not correct the breach within thirty (30) days after being notified in writing by the other party. (7) Any state or other jurisdiction penalizes a party for administering the Plan under the terms of this Agreement. In this situation, the party may immediately discontinue the Agreement's application in such state or jurisdiction. Notice must be given to the other party when reasonably practical. The Agreement will continue to apply in all other states or jurisdictions. (8) There may be other places in this Agreement authorizing you or us to terminate the Agreement.

**Section 10.2  Run-Out Administration.**  We will provide claim processing services for a period of six (6) months following the Agreement's termination on claims for health services incurred prior to the termination of the Agreement Period. We will provide claim processing services in excess of six (6) months, for up to twelve (12) months, upon your request at the time either party provides notice of termination. The fee for the run-out services that are in addition to the aforementioned six (6) months will be mutually agreed upon and determined at the time either party provides notice of termination. All of the other terms of this Agreement will apply to these post-termination services. We will not provide these services after the Agreement's termination if the Agreement was terminated because you failed to pay us undisputed fees due, or, you did not provide the funding required under Section 12.3, or, when there is termination for any other material breach. The fee for run-out services is set forth in Exhibit A.

When this Agreement terminates, the method of providing funds for Plan benefits remains in place for a limited period of time. At the end of this period, we will place stop payments, at your expense, on all checks that remain uncashed.

## Section 11  -  Mediation

In the event that any dispute, claim, or controversy of any kind or nature relating to this Agreement arises between the parties, the parties agree to meet and make a good faith effort to resolve the dispute. If the dispute is not resolved within thirty (30) days after the parties first met to discuss it, and either party wishes to pursue the dispute further, that party shall refer the dispute to non-binding mediation under the Commercial Mediation Rules of the American Arbitration Association ("AAA"). In no event may the mediation be initiated more than one year after the date one party first gave written notice of the dispute to the other party. A single mediator engaged in the practice of law, who is knowledgeable about ERISA and employee benefit plan administration, shall conduct the mediation under the then current rules of the AAA. The mediation shall be held in Hartford, Connecticut or a mutually agreeable site.

## Section 12 - Services Provisions

**Section 12.1  Claims Processing.**  Claims for Plan benefits must be submitted in a form that is satisfactory to us. We will determine whether a benefit is payable under the Plan's provisions.

In applying the Plan's provisions, we will use claim procedures and standards that we develop for benefit claim determination. You delegate to us the discretion and authority to use such procedures and standards.

The rate of accuracy of benefit payments shall be consistent with the accuracy rate that a reasonably prudent claims administrator would be expected to achieve under similar circumstances.

Plan benefits for health care services rendered by Network Providers will be equal to the amounts the Network Providers agreed to accept in the contractual arrangements governing their participation in the Managed Care Network. These amounts could be traditional fees for services, capitated rates, or some other kind of fee or rate. A capitated rate is an amount paid to a health care provider on a per participant per month basis or a similar arrangement.

**Section 12.2  Benefit Determination and Appeals.**  You appoint us a named, ERISA fiduciary under the Plan with respect to (i) performing claim processing and payment, (ii) performing the fair and impartial review of initial appeals, and (iii) performing the fair and impartial review of final appeals. As such, you delegate to us the discretionary authority to (i) construe and interpret the terms of the Plan, (ii) to determine the validity of charges submitted to us under the Plan, and (iii) make final, binding determinations concerning the availability of Plan benefits.

If it is determined that a benefit is payable, we will issue a check for, or otherwise credit the benefit payment to the appropriate payee. If we determine that all or a part of the benefit is not payable under the Plan, we will notify the claimant of the denial and of the claimant's right to appeal the denial. This notification will be designed to comply with ERISA's requirements for denial notices.

If we deny a Plan benefit claim, the claimant shall have the appeal rights (including the right to voluntary independent external review of the clinical issues involved in the appeal) set forth in the Summary Plan Description, and/or which are required under applicable law. We will process the appeal and determine whether a Plan benefit is available.

If, after the exhaustion of all levels of appeal with us (including voluntary independent external review), we determine that the Plan benefit is still not available, we will notify the claimant that the denial has been upheld. This notice will be designed to comply with the applicable ERISA requirements for claim denial notices. This determination will be final and binding on the claimant, and all other interested parties.

**Section 12.3  Voluntary External Review Program.**  We will notify claimants of the option to request a voluntary external review of clinical coverage decisions following the required internal appeal process. We will: (a) provide claimant with the necessary procedures to obtain the review, (b) coordinate submission of the claimant's case to the external review organization, and (c) notify the claimant of case decision reversals. You will be charged a fee for each external review. This fee will be based on the actual cost charged by the external review organization for the review of the case in question.

**Section 12.4  Providing Funds for Benefits.**  The Plan is Self-Funded. You are solely responsible for providing funds for payment for all Plan benefits payable to Network Providers or non-Network Providers.

**Bank Account.**  You will open and maintain a Bank Account at the Bank for purposes of providing us a means to access your funds for payment of Plan benefits and expenses. The Bank Account will be a part of the network of accounts that have been established at the Bank for our self-funded customers. However, the Bank Account will belong to you and the funds in it are yours.

8

**Balance In Account.** You will maintain a minimum balance in the Bank Account in an amount equal to not less than two (2) days of expected Bank Account activity. We will establish this amount based upon expected plan benefit payments with appropriate adjustments for anticipated non-daily activity (e.g., prescription drug benefits and administrative fee payments) as determined by us. We will determine if circumstances warrant increasing this minimum balance, and will notify you if and when the required balance or the amount identified above changes.

**Issuing and Providing Funds for Checks.** The checks we write and issue to pay Plan benefits under this Agreement will be written on one or more common accounts that are a part of the network of accounts maintained at the Bank for our self-funded customers. When the checks for Plan benefits are presented to the Bank, the Bank will notify us and we will direct the Bank to accept or reject the checks. Then the Bank will withdraw funds from your Bank Account to fund the checks that are cashed.

**Transfers of Funds.** Funds will also be withdrawn from your Bank Account when a transfer of funds we have made to pay Plan benefits is made by the Bank. For example, when a wire transfer has been made to a health care provider to pay benefits under the Plan.

**Service Fees and Other Expenses.** Funds will also be withdrawn from your Bank Account on the due date of any service fees which you have authorized to be paid to us and for the payment of other Plan expenses from your Bank Account.

**Calls for Funds.** The withdrawals for Plan benefits and service fees are paid for by the balance you maintain in the Bank Account.

Every business day, you will transfer to the Bank Account the amount of funds which have been withdrawn from your Bank Account over the past two (2) business day(s). You will transfer that amount using a method agreed upon by you, us and the Bank. This transfer will replenish the balance you are maintaining in the Bank Account. The number of days between transfers and the method of transfer are based on your financial condition as of the Effective Date as viewed by us, and your compliance with material financial obligations. In the event we determine, based on reasonable information and belief, that your financial condition has deteriorated, or you continue to fail to comply with material financial obligations set forth in this Agreement, we reserve the right to increase the frequency of such fund transfers and/ or change the method of transfer.

**Underfunding.** If you do not provide the required amounts for the minimum balance in your Bank Account or for the funds that have been withdrawn from the Bank Account: (1) You must immediately correct the deficiency and provide prompt notice to us in either event. (2) If we first learn of the funding deficiency, we will provide you notice so that you can correct the problem. (3) You agree that we may stop issuing checks and suspend any of our other services under this Agreement for the period of time you do not provide the required funding provided the notice required in item (2) is provided. (4) We can also elect to terminate this Agreement effective as of any date after one business day after we have given you notice of the funding deficiency, if you do not provide the required payment within this time period. The notice provisions contained in Termination Events, Section 10.1, do not apply to this breach. We may also place stop payments on checks, at your expense, if we determine that you do not have enough funds in the Bank Account to pay the checks that have been issued but not yet cashed. You will pay interest on the amount of underfunding at the standard rate that we charge to our self-funded customers for underfunding of bank accounts.

At the end of each claims processing time period, we will provide notice to you of the amount needed to pay claims processed and fees that are due. Within forty-eight (48) hours of such notice you will transfer via wire transfer the designated amount to our Bank Account for payment of Plan benefits. Unless we determine that your financial condition as of the Effective Date as viewed by us has deteriorated, or you continue to fail to comply with material financial obligations set forth in this Agreement, you will initiate the fund transfers. If such conditions occur you agree to provide us with the authority to initiate the transfers.

**Outstanding Checks.** We will place stop payments, at your expense, on all checks we have issued under this Agreement if they have not been cashed within a certain period. This period will be reasonable, determined by us, and applied on a consistent basis to our self-funded customers.

9

**Termination of Agreement.** When this Agreement terminates, the method of providing funds for Plan benefits remains in place for a limited period of time. After this period is over, that method of funding will cease and, instead, you will deposit and maintain in the Bank Account enough funds to cover all checks for Plan benefits that have been issued but not cashed. This balance will remain in the Bank Account for a limited period of time in order to fund the outstanding checks. This period will be reasonable, determined by us, and applied on a consistent basis to our self-funded customers and communicated to you. At the end of this period, we will place stop payments, at your expense, on all checks that remain uncashed, and you will close your Bank Account and recover any funds remaining in it. We will provide bank account statements and bank reconciliation reports, including reports you need for the purposes of escheatment.

**Section 12.5  Managed Care Network Services.**  We will make available to Participants a Managed Care Network, located in agreed to geographical sites with Network Providers who render health care and/or mental health and substance abuse care. We will provide you with directories of Network Providers, and with periodic updates and/or telephonic access to the information in the directories.

The make-up of the Managed Care Network can change at any time. Notice will be given in advance or as soon as reasonably possible.

We will maintain a grievance process so that Participants may obtain assistance with, and express their opinions about, their use of the Managed Care Network.

We do not employ Network Providers and they are not our agents or partners. Network Providers participate in Managed Care Networks only as independent contractors. Network Providers and the Participants are solely responsible for any health care services rendered to Participants.

**Section 12.6  Medical Management Services.**  We shall provide our care coordination services in accordance with the provisions contained in this section. The care coordination program focuses on offering education, accelerating access to care and providing surveillance and monitoring of chronic conditions. These services include the review of Participants' diagnosis and proposed health care treatments with respect to whether or not the service is appropriate to treat the condition. The services are designed to facilitate member education, identify and prevent delays in treatments, and provide intervention with respect to Participants' health care needs that are highly likely to drive utilization and medical expenses of the Plan. We will review health care services and supplies to determine whether they are covered services under the Plan. If we determine that services or supplies are not covered under the Plan, then we will provide the appeal services outlined in Section 12.2 of the Agreement.

**Section 12.7  Additional Medical Management Services.**

**Case Management Services.**  We may provide, when appropriate for the individual Participant, certain case management services, which are designed to provide a proactive, systematic process of coordination of health care services, including the evaluation of inpatient, outpatient and ancillary services, member education, the review of the short term outpatient care needs and where appropriate, coordination and facilitation of discharge planning needs. These services address the unmet health care needs of Participants who are not eligible for a disease management program under the Plan but are at significant risk for declining health status and high medical expenses.

We also provide an Alternative Benefit Program (ABP) of benefit coverage for health care services. This ABP program is designed by us for the diagnosis and/or treatment of a particular Participant's illness or injury with appropriate and cost effective health care services and supplies alternatives that would otherwise not be covered by the Plan. The Plan will pay for and cover as Plan benefits the health care services and supplies contained in the ABP program. You consent to our use and administration of the ABP program and delegate to us the discretion and authority to develop and revise ABPs.

We will work with Participants who satisfy the criteria for participation in case management services to develop a program of benefit coverage with appropriate and cost-effective heath care services and supplies for the diagnosis and/or treatment of the Participant's condition. If the Participants and health care provider are not willing to participate in the process, we will not provide these services.

### Section 12.8   Transplant Benefit Management Services.

Your Plan has agreed to access Transplant Benefit Management Services, as described below.

a. **U.R.N. Transplant Network Access.** We agree to provide you access to a network of credentialled transplant programs. Transplant services rendered by those facilities, and the discounted rates for those services, are available to you based upon the contractual relationship between our affiliate, United Resource Networks (U.R.N.) and the facilities contained within the U.R.N. Transplant Network. Access to these relationships is made available to all Participants who are authorized to receive transplant- related services.

U.R.N. determines what transplant programs are qualified for participation in the U.R.N. Transplant Network and will provide you with a list of those programs. The list of participating programs changes from time to time and you will be provided written notice of changes. You agree to amend the Plan consistent with the changes made to the list within a reasonable period of time after notice is given.

The following services and supplies offered by a participating transplant program are typically included in the U.R.N. Transplant Network contractual relationship: evaluation of the Participant for transplant; donor searches; organ acquisition and procurement; hospital and physician fees; transplant procedures; and follow-up care for a period up to one year after the transplant.

You agree that the Plan will pay for and cover as Plan benefits the services and supplies rendered to Participants in a participating program in accordance with this section. You delegate to us the discretion and authority to approve for payment under the Plan those services and supplies rendered to Participants for transplant services rendered at participating programs.

If a Participant chooses not to receive transplant services at a U.R.N. Transplant Network facility, and the Plan elects to pay for transplant services rendered at another facility, we may negotiate a discounted rate for transplant services on behalf of the Participant and the Plan as outlined in subsection c. below.

U.R.N. shall not be responsible for the medical outcomes or the quality or competence of any provider or facility rendering services, or the payment for services rendered by the provider or facility.

b. **Transplant Access Program.** We will also provide you with access to a group of transplant programs that, while not credentialled as part of the U.R.N. Transplant Network, have agreed to provide transplant services at discounted rates. U.R.N. coordinates the contractual arrangement with programs participating in the Transplant Access Program. All Participants authorized to receive transplant-related services may access these relationships.

You will be provided a list of Transplant Access Program participating facilities. This list will be modified from time to time and you will be provided written notice of changes.

11

The following services and supplies offered by a participating transplant program are typically included in the Transplant Access Program contractual relationship: evaluation of the Participant for transplant; donor searches; organ acquisition and procurement; hospital and physician fees; and transplant procedures. The relationship with these programs does not typically include a discount for follow-up care.

You agree that the Plan will pay for and cover as Plan benefits the services and supplies rendered by the transplant programs participating in the Transplant Access Program. You delegate to us the discretion and authority to approve for payment under the Plan those services and supplies rendered to Participants when these services cannot be provided through use of the U.R.N. Transplant Network as described in subsection a. above.

If a Participant chooses not to receive his or her transplant care at a U.R.N. Transplant Network facility or a Transplant Access Program facility, and the Plan elects to pay for transplant services rendered at another facility, we may negotiate a discounted rate on behalf of the Participant and the Plan as outlined in subsection c. below.

U.R.N. shall not be responsible for the medical outcomes or the quality or competence of any provider or facility rendering services, or the payment for services rendered by the provider or facility.

c.    **Transplant Cost Negotiation.** If the Participant chooses not to receive his or her care from a U.R.N. Transplant Network or through the Transplant Access Program we will negotiate a discounted reimbursement rate with another transplant program for transplant services upon request.

You authorize and delegate to U.R.N. the discretion to undertake these negotiations on behalf of the Plan. Once an agreement is reached with the transplant program, the provider will be instructed to submit the claims to U.R.N. and U.R.N. will reprice the claims in accordance with the negotiated rate for those services. Once repriced, U.R.N. will forward the repriced claims to us and we shall pay the provider within thirty (30) days of receipt of a full and accurate claim and invoice.

The fee for this service is $8,000 per negotiation. You authorize us to pay U.R.N. its fee directly from the Bank Account.

U.R.N. shall not be responsible for the medical outcomes or the quality or competence of any provider or facility rendering services, or the payment for services rendered by the provider or facility.

**Section 12.9   Claim Recovery Services.** We will provide recovery services for Overpayments. We will reimburse you for, and you will not be responsible for recovery costs associated with, any Overpayments made by us due to our gross negligence as determined by a court or other tribunal.

We will provide services to recover Plan benefits that were paid and are recoverable by the Plan because payment was or should have been made by a third party (other than in connection with coordination of benefits, Medicare, or other Overpayments) for the same medical expense. This is referred to as "Third Party Liability Recovery" (also commonly known as "subrogation"). Some examples of third parties who are legally responsible for the payment of a health claim include tort feasors, individuals involved in an accident, liability insurance carriers, automobile insurance carriers, premises medical insurance or worker's compensation carriers.

You will be charged fees when any of the services described in this section are provided by us through a subcontractor. The fees are deducted from the actual recoveries. You will be credited with the net amount of the recovery. We will provide you with a written notice of the basis of the fees for which you are charged; and, advance notice of any material changes in such fees or our recovery services.

You delegate to us the discretion and authority to develop and use standards and procedures for any recovery under this section, including but not limited to, whether or not to seek recovery, what steps to take if we decide to seek recovery, and under what circumstances to compromise a claim or settle for less than the full amount of the claim. You recognize that use of these standards and procedures may not result in recovery or in full recovery for any particular case. We will not pursue any recovery if any applicable law does not permit it, or, if recovery would be impractical. We may choose to initiate litigation to recover payments, but we have no obligation to pursue litigation. If we initiate litigation, you will cooperate with us in the litigation.

If this Agreement terminates, or, if our recovery services terminate, we can continue to recover any payments we are in the process of recovering. The appropriate fees will continue to be deducted from the actual recovery, when and if a recovery is obtained.

You will not engage any entity except us to provide these recovery services without our prior approval.

**Section 12.10  Abuse and Fraud Management.**  We will provide services related to the detection and prevention of abusive and fraudulent claims. In combination with Claim Recovery Services above, we will also provide claim recovery services.

Our Abuse and Fraud Management processes will be based upon proprietary and confidential procedures, modes of analysis and investigations we develop.

We will use these procedures and standards in delivering Abuse and Fraud Management services to you and our other customers. These procedures and standards include, but are not limited to: whether or not to seek recovery, what steps to take if we decide to seek recovery, and under what circumstances to compromise a claim or settle for less than the full amount. You delegate to us the discretion and authority to use such procedures and standards, including the authority to undertake actions, including legal actions, which have the largest impact for the largest number of customers.

You recognize that the use of these procedures and standards may not result in recovery or in full recovery for any particular case. We do not guarantee or warranty any particular level of prevention, detection, or recovery. We agree to perform Abuse and Fraud Management services pursuant to the industry standards for such services.

Fees apply for abuse and fraud recoveries, and are equal to our recovery costs and will be deducted from the actual recoveries. If this Agreement terminates, or if our claim recovery services terminate, we can elect to continue abuse and fraud recoveries. The contingency fees will continue to apply.

**Section 12.11  Claims by Other Parties.**  If there is any claim that we are an entity responsible for paying benefits or making any payment on behalf of the Plan or a Participant to another health benefits plan, or to any other person or entity, including but not limited to a claim based upon the federal Medicare Secondary Payer laws, you shall indemnify and hold us harmless with respect to such a claim and all costs associated with the claim. You shall cooperate with us as necessary and appropriate to facilitate timely payment. Where necessary or appropriate you will administer and pay such claims. When such claims involve taxes, assessments or other governmental charges, the claims shall also be subject to Section 6 of this Agreement.

**Section 12.12  Escheat.**  You are solely responsible for complying with all abandoned property or escheat laws, and for making any required payments and for filing any required reports, to the extent they may be applicable.

**Section 12.13  Assistance with General Plan Administration.**  We will provide administrative services including: (a) our employer administration kit; (b) administration forms and service orientation; (c) a toll-free customer service telephone line for Participants; (d) enrollment support; and (e) identification cards for Participants. Custom services, such as special forms or administrative support that exceeds the level standardly offered to our self-funded customers will be subject to an additional fee determined by us.

We will also provide you with the standard reports that we provide to our self-funded customers. Additional reports will be provided as agreed to by the parties. An additional cost may apply. If reports are provided

through our Systems, we further reserve the right, from time to time, to change the content, format and/or type of the reports that are standardly provided.

You may request that we provide services in addition to those set forth in this Agreement. If we agree to provide them, those services will be governed by the terms of this Agreement, unless otherwise specified in an amendment to this Agreement. You will pay an additional fee, determined by us, for those services.

**Section 12.14  Summary Plan Description.** In conjunction with your request for the development of the Summary Plan Description, we will prepare and provide you with two draft booklets in English. You will develop the Summary Plan Description describing the Plan and in accordance with this Agreement. You will provide us with a copy of the Summary Plan Description for our review in a timely manner. You will amend the Summary Plan Description if we determine that provisions and definitions (e.g., claim procedures, appeals, general exclusions, etc.) are not acceptable to, or cannot be administered by, us. You are responsible for the legal sufficiency of the Summary Plan Description, including any legally required information.

**Section 12.15  Facility Reasonable Charge Determination and Negotiation Reductions.** We will evaluate certain facility-billed charges which may exceed the reasonable charge reimbursable under Plan terms, make payment in accordance with appropriate guidelines, and negotiate with the facility as needed for reduction of billed charges. The additional service charge for this service is described in Exhibit A.

**Termination.** We can terminate the Facility Reasonable Charge program in whole or in part at any time for any reason.

In the event of termination, we can elect to continue such reviews and negotiations that are in progress at the time of such termination. The additional service charge described in Exhibit A will continue to apply.

**Section 12.16  Shared Savings Program.** For the service fee specified in Exhibit A, we may make available the Shared Savings Program available to some or all of your Plan, when such discounts are available to us. The program provides access to discounted charges from health care providers which are made available to us for use with the employee benefit plans that we administer on behalf of our customers.

The amount of benefits payable under the portion of the Plan to which the discounts apply will be determined based on the discounted charges under the program. If a Participant is enrolled in a network plan and receives services from a network provider under the terms of that plan, then health benefits payable for services rendered by that provider will be based on the applicable rates for fees for services set forth in our provider agreement with that provider rather than based on the discounts available under the Shared Savings Program. In this case, those benefits will not be included in the calculation of the "Savings Obtained" under the Shared Savings Program and the service fee for the Shared Savings Program will not apply to those benefits.

Listings of providers subject to the discounts under this program will not be provided to you or to Participants. You understand that the services provided under the program are to provide access to provider discounts only. Our services under this program do not include credentialing of providers or other managed care network services.

We can terminate the Shared Savings Program in whole or in part at any time for any reason. You can terminate the program at any time for any reason by giving us written notice. We will implement the termination within a reasonable period of time after receiving the notice.

**Section 12.17  Optum Management Programs.** For the service fee specified in Exhibit A, we will provide Participants with access to various publications that are amended from time to time, and Optum NurseLine, a 24-hour service providing general health information and identification of specific health related concerns, and, provision of education information regarding those concerns, by registered nurses by telephone or via an audio health information library.

14.

## Section 13  -  Miscellaneous

**Section 13.1  Subcontractors.**  We can use our affiliates or other subcontractors to perform our services under this Agreement. However, we will be responsible for those services to the same extent that we would have been had we performed those services without the use of an affiliate or subcontractor.

**Section 13.2  Assignment.**  Except as provided in this paragraph, neither party can assign this Agreement or any rights or obligations under this Agreement to anyone without the other party's written consent. That consent shall not be unreasonably withheld. Notwithstanding, we can assign this Agreement, including all of our rights and obligations to our affiliates, to an entity controlling, controlled by, or under common control with us, or a purchaser of all or substantially all of our assets, subject to notice to you of the assignment.

**Section 13.3  Governing Law.**  This Agreement is governed by ERISA and, if applicable, the laws of the State of Connecticut. **Section 13.4  Entire Agreement.**  This Agreement, with its exhibits, constitutes the entire Agreement between the parties governing the subject matter of this Agreement. This Agreement replaces any prior written or oral communications or agreements between the parties relating to the subject matter of this Agreement. The headings and titles within this Agreement are for convenience only and are not part of the Agreement.

**Section 13.5  Amendment.**  Except as may otherwise be set forth in this Agreement, the Agreement may be amended only by both parties agreeing to the amendment in writing, executed by a duly authorized person of each party.

**Section 13.6  Waiver/Estoppel.**  Nothing in this Agreement is considered to be waived by any party claiming the waiver receives the waiver in writing. No breach of the Agreement is considered to be waived unless the non-breaching party waives it in writing. A waiver of one provision does not constitute a waiver of any other. A failure of either party to enforce at any time any of the provisions of this Agreement, or to exercise any option which is herein provided, shall in no way be construed to be a waiver of such provision of this Agreement.

**Section 13.7  Notices.**  Any notices, demands or other communications required pursuant to this Agreement shall be in writing and may be provided via electronic means (e.g. e-mail, facsimile transmission, electronic posting, etc.) or by United States Postal Service by certified or registered mail, return receipt requested, postage prepaid, or delivered by a service that provides written receipt of delivery.

## Section 14  -  System Access

**Section 14.1  System Access.**  We grant you the nonexclusive, nontransferable right to access and use the functionalities contained within the Systems, under the terms set forth in this Agreement. You agree that all rights, title and interest in the Systems and all rights in patents, copyrights, trademarks and trade secrets encompassed in the Systems will remain ours. In order to obtain access to the Systems, you shall obtain, and be responsible for maintaining, at no expense to us, the hardware, software and Internet browser requirements we provide to you, including any amendments thereto. You shall be responsible for obtaining an Internet Service Provider or other access to the Internet. You shall not (a) access Systems or use, copy, reproduce, modify, or excerpt any of the Systems documentation provided by us in order to access or utilize Systems, for purposes other than as expressly permitted under this Agreement; or (b) share, transfer or lease your right to access and use Systems, to any other person or entity which is not a party to this Agreement. You may designate any third party to access Systems on your behalf, provided the third party agrees to these terms and conditions of Systems access and you assume joint responsibility for such access.

15

**Section 14.2   Security Procedures.**   You shall use commercially reasonable physical and software-based measures, and comply with our security procedures, as may be amended from time to time, to protect the System, its functionalities, and data accessed through Systems from any unauthorized access or damage (including damage caused by computer viruses). You shall notify us immediately if any breach of the security procedures, such as unauthorized use, is suspected.

**Section 14.3   System Access Termination.**   We reserve the right to terminate your System access (a) on the date you fail to accept the hardware, software and browser requirements provided by us, including any amendments thereto or (b) immediately on the date we reasonably determine that you have breached, or allowed a breach of, any applicable provision of this Agreement. Upon termination of this Agreement, you agree to cease all use of Systems, and we shall deactivate your identification numbers and passwords and access to the System.

## EXHIBIT A  -  SERVICE FEES

This exhibit lists the service fees you must pay us for our services during the term of the Agreement. These fees apply for the period from January 1, 2003 through December 31, 2003. You acknowledge that the amounts paid for administrative services are reasonable.

These fees are based upon a total number of 15,774 Employees.

These fees are subject to the adjustments set forth in Exhibit B.

**Administrative Fees**

**The sum of the following:**

$25.72 per month per Employee covered under the "United HealthCare Options PPO" portion of the Plan.

$17.94 per month per Employee covered under the "United HealthCare Options PPO Out of Area" portion of the Plan.

30% of the "Network Savings" obtained through benefits paid to Network Providers as a result of network access under the United HealthCare Options PPO Out of Area portion of the Plan.

"Network Savings" means the amount of covered charges that would have been payable to a Network Provider, including amounts payable by both the Participant and the Plan, if no discount were applicable, minus the amount of covered charges actually paid to the Provider, again, including amounts paid by both the Participant and the Plan, based on the applicable rates for fees for services set forth in our provider agreement with the Network Provider.

The following benefits will not be included in the calculation of the "Network Savings" amount:

a.  benefits paid under the Plan as a secondary plan, as described in the coordination of benefits provision of the Plan,

b.  benefits paid for a Medicare beneficiary when the benefits under the Plan are paid as a secondary plan

c.  benefits paid under the Transplant Benefit Management Program.

**Service Fee for Facility Reasonable Charge Determination and Negotiation**

You will pay a fee for our services, as described in Section 12, equal to thirty percent (30%) of the amount of reductions obtained through our efforts.

We will bill you for the amounts that you owe us. The bill will reflect reductions obtained during the preceding month and adjustments, if any, from previous months.

**Service Fee for Shared Savings Program**

You will pay a fee equal to thirty-five percent (35%) of the "Savings Obtained" as a result of the Shared Savings Program described in Section 12. "Savings Obtained" means the amount that would have been payable to a health care provider, including amounts payable by both the Participant and the Plan, if no discount were available, minus the amount that is payable to the health care provider, again, including amounts payable by both the Participant and the Plan, after the discount is taken.

**One Time Service Fees**

The charges associated with customizing information on ID cards are a one-time charge:

$10,000 one-time charge for customizing information on ID cards.

## EXHIBIT B  -  PERFORMANCE STANDARDS FOR HEALTH BENEFITS

**Performance Standards**

### Adjustment To Service Fees

The Standard Medical Service Fees (excluding Optional and Non-Standard Fees) payable by Cintas Corporation under the Administrative Services Agreement will be adjusted in accordance with the performance standards set forth below. Unless otherwise specified, these standards apply to the medical benefits and are effective for the period beginning January 1, 2003 and ending on December 31, 2003 ("Guarantee Period"). The Claim Operations and Customer Phone Service Guarantees will be measured and assessed on a quarterly basis. The settlement of penalties will be performed on an annual basis at the time of the year end reconciliation. With respect to the aspects of our performance addressed in this exhibit, these fee adjustments are your exclusive financial remedies.

### Core Performance Measures

### Administrative/Implementation Performance Standards

### Use of a formal Implementation Plan

Case implementations require the timely and accurate completion of tasks by Uniprise and by Cintas Corporation. The completion of one task may be dependent on the completion of another task by the other party. It is imperative, therefore, that a formal implementation plan, which defines key tasks, dependencies and completion dates, be developed and agreed to by both parties. The lack of a mutually agreeable formal implementation plan will nullify these implementation guarantees in total. Failure on Cintas Corporation's part to complete, by the agreed upon dates, the key dependent tasks associated with the implementation guarantees outlined below will also nullify that guarantee. Guarantees placed on implementation services do not apply to ongoing performance.

### ID Cards

Uniprise will mail 99 percent of the ID cards within ten business days after the final eligibility data has been system loaded and passed a quality assurance check and a system load test.

Failure to deliver on the ID Card guarantee will result in a credit to the service fees in the next agreement period. The maximum amount of the credit will be 2% of fees. The actual credit will be calculated on a pro-rated basis, based on the actual number of late cards as a percent of the total number of cards.

ID Card turnaround time guarantees are based on Uniprise's performance during the implementation process. These service performance measurements and guarantees do not apply to Uniprise's ongoing performance in this area.

19

## Claim Ready Date

Uniprise will be ready to pay electronic claims through the UNET claims systems by the later of the designated effective date or within 18 business days after the following key implementation plan tasks are completed:

- Account structure (e.g., reporting and billing splits) is defined and agreed to.

- Benefit plan details (e.g., insuring rules and coverages) are defined and agreed to.

- Final eligibility has been received from Cintas Corporation and successfully tested by Uniprise.

- If so negotiated, deductibles and lifetime maximums from the previous carrier must be received and loaded electronically.

Failure to deliver on the Electronic Claim Ready Date guarantee will result in a credit to the service fees in the next agreement period. The maximum amount of the credit will be 2% of fees. Credits against this performance measure will be applied on a gradient, where 25% of the credit amount will be credited for each additional business day beyond the period described above.

## Eligibility Loading

Uniprise will load the initial implementation electronic eligibility file within 3 business days of receipt. An electronic load will be considered to have met the standard if the elapsed time between the date the file is received by Uniprise and the date upon which the file is loaded to the eligibility system(s) is 3 business days or less. The guarantee is waived for electronic files that cannot be loaded due to file errors or for files that require reformatting of data. Files must be received prior to 12:00 noon, Eastern Time, on the date as determined by a preset schedule of file delivery dates. Otherwise, written notification of file delivery (off-schedule) must be provided and receipt confirmed by Uniprise. If the file is received after 12:00 noon, Eastern Time, the guarantee period commences the following business day.

Failure to load the electronic eligibility file to the eligibility system(s) within 3 business days will result in a credit to the service fees in the next agreement period. The maximum amount of the credit will be 2% of fees. Credits against this performance measure will be applied on a gradient, where 25% of the credit amount will be credited for each additional business day beyond the 3 day period described above.

## Claim Operations Performance Standards

For the following "Claim Operations Performance Guarantees", the term "claim" shall mean a written request for payment of a plan benefit made by an enrollee, physician or other healthcare provider.

## Time to Pay

Uniprise will complete processing of 90 percent of all claims we receive within 10 business days of receipt, as evidenced by Uniprise's date stamp. Timeliness will be measured using the "Time to Pay" report produced by Uniprise on a quarterly basis. The overall performance period result is recalculated using the raw data for the period. The "Time to Pay" results are always rounded to the nearest whole percent.

A "claim" is a request for payment of a plan benefit made by an enrollee, physician or other healthcare provider. A claim will be considered processed when the claim has been completely reviewed and a payment determination has been made. Time to pay is measured the same way regardless of the timing of Uniprise's responses to a claimant.

Failure to maintain a 90 percent score in any quarter will result in a credit to the service fees for that quarter. The maximum amount of the credit will be 2% of fees. Credits against this performance measure

will be applied on a gradient, where 25% of the credit amount will be credited for each day Uniprise falls below the 90% in ten day measure described above.

## Financial Accuracy

Uniprise will maintain a Financial Accuracy rate of not less than 99 percent in any quarter. Financial Accuracy is measured by collecting a statistically significant random sample of claims processed. The sample is reviewed to determine the percentage of claim dollars processed correctly out of the total claim dollars submitted for payment. The measurement will be done quarterly by Uniprise's standard internal quality assurance program based on a periodic audit of all claims processed for the Cintas Corporation's account. The overall performance period result is recalculated using the raw data for the period.

A "claim" is a request for payment of a plan benefit made by an enrollee, physician or other healthcare provider.

Failure to maintain a 99 percent score in any quarter will result in a credit to the service fees for that quarter. The maximum amount of the credit will be 2% of fees. Credits against this performance measure will be applied on a gradient, where 25% of the credit amount will be credited for each ¼ percent under the 99% target specified above.

## Procedural Accuracy

Uniprise will maintain a Procedural Accuracy Rate of not less than 95 percent in any quarter. Procedural Accuracy is measured by collecting a statistically significant random sample of claims processed by the offices servicing Cintas Corporation's account. The sample is reviewed to determine the percentage of claims processed without non-financial errors. The measurement will be done quarterly by Uniprise's standard internal quality assurance program based on a periodic audit of all claims processed for the Cintas Corporation's account. The overall performance period result is recalculated using the raw data for the period.

A "claim" is a request for payment of a plan benefit made by an enrollee, physician or other healthcare provider.

Failure to maintain a 95 percent score in any quarter will result in a credit to the service fees for that quarter. The maximum amount of the credit will be 2% of fees. Credits against this performance measure will be applied on a gradient, where 25% of the credit amount will be credited for each ½ percent under the 95% target specified above.

## Items Excluded from Claim Operations Performance Measurements

Products or services for which UnitedHealth Group contracts with an outside vendor are managed independently of any performance guarantee between Cintas Corporation and UnitedHealth Group. The quality and timeliness of these vendors' services are reflected in the guarantees offered by UnitedHealth Group. Therefore, while these services may be guaranteed, the guarantee is not specific to the services rendered by the vendor.

The claims that are included in Claim Operations performance categories are limited to medical claims processed through the UNET claims systems. Claims processed through any other system, including claims for other products such as vision, dental, or pharmacy coverage are not included in the calculation of the performance measurements stated above.

## Customer Phone Service Performance Standards

## Average Speed to Answer

This standard applies to the claim office and/or the health plan customer services office(s) that provide service for Cintas Corporation's participants. Uniprise will guarantee that calls will sequence through its automated telephone call distribution system and be answered by a customer service representative in 30 seconds or less, on average. The Average Speed to Answer will be measured quarterly at the split-level by the standard tracking reports produced by its automated phone system for all Cintas Corporation's participants' calls handled during the guarantee period.

The calculation of Uniprise's performance against this target is based upon the weighted average results for all centers servicing Cintas Corporation's account. The weight will be determined based on the percentage of employees served by each center.

If the Average Speed to Answer in any quarter is greater than 30 seconds, on average, a credit to the service fees for that quarter will be made. The maximum amount of the credit will be 2% of fees. Credits against this performance measure will be applied on a gradient, where 25% of the credit amount will be credited for every two seconds over the 30 second target specified above.

## Abandonment Rate

This standard applies to the claim office and/or the health plan customer services office(s) that provide service for Cintas Corporation's participants. Uniprise will guarantee that calls will sequence through its automated telephone call distribution system such that the average abandonment rate will be no greater than 5 percent. The Abandonment Rate results will be measured quarterly at the split-level by the standard tracking reports produced by its automated phone system for all Cintas Corporation's participants' calls handled during the guarantee period.

The calculation of Uniprise's performance against this target is based upon the weighted average results for all centers servicing Cintas Corporation's account. The weight will be determined based on the percentage of employees served by each center.

If the Abandonment Rate in any quarter is greater than 5 percent, on average, for all locations providing customer phone service to Cintas Corporation's employees, a credit to the service fees for that quarter will be made in the next agreement period. The maximum amount of the credit will be 2% of fees. Credits against this performance measure will be applied on a gradient, where 25% of the credit amount will be credited for each ½ percent over the 5 percent target specified above.

## Call Quality Score

Uniprise will maintain a Call Quality Score of not less than 90 percent in any quarter. Call Quality is measured by collecting a random sample of calls answered by the office servicing Cintas Corporation's account. The sample is reviewed to determine the percentage of customer service quality points earned. The measurement will be done quarterly by Uniprise's standard internal call quality assurance program based on periodic silent monitoring of calls made by Cintas Corporation's participants. The overall performance period result is recalculated using the raw data for the period.

The calculation of Uniprise's performance against this target is based upon the weighted average results for all centers servicing Cintas Corporation's account. The weight will be determined based on the percentage of employees served by each center.

If the Call Quality Score in any quarter is less than 90%, a credit to the service fees will be made for that quarter. The maximum amount of the credit will be 2% of fees. Credits against this performance measure will be applied on a gradient, where 25% of the credit amount will be credited for every two percent below the 90% target specified above.

## Employee Satisfaction Performance Standard

### Overall Satisfaction

This standard applies to the customer service offices that provide services for Cintas Corporation's employees. Uniprise will conduct, on an annual basis, a Uniprise Customer Satisfaction Survey. The Overall Satisfaction Question used reads "Overall, how satisfied are you with the way Uniprise administers your medical health insurance plan, such as processing your claim or helping answer any questions or resolving any problems you may have?" If less than 80% of the respondents, based on the average results for all centers providing services for Cintas Corporation's employees, are satisfied overall (i.e., if respondents do not respond with either completely satisfied, very satisfied or somewhat satisfied), a credit to the service fee will be made in the next agreement period. The amount of credit will be 1% of fees.

This guarantee does not apply to system platforms other than UNET or products not currently administered on UNET.

## Customer Satisfaction Performance Standard

### Overall Satisfaction

Uniprise will conduct a customer satisfaction survey on at least an annual basis. This survey is conducted using the Account Management Scorecard survey instrument, and the results shared with our customers. The Overall Satisfaction Question reads "How satisfied are you overall with the Account Management Team (AMT)?" If respondents do not specifically indicate that they are satisfied overall (i.e., if respondents do not respond with either satisfied or extremely satisfied), a credit to the service fee will be made in the next agreement period. The amount of the credit will be 1% of fees.

## Change in Reporting Format

We reserve the right from time to time to replace any report or change the format of any report referenced in these standards. In such event, the standard will be modified to the degree necessary to carry out the intent of the parties.

## Non-Performance

We shall not be required to meet any of the performance standards provided for in this Exhibit to the extent we fail to meet these standards due to fire, embargo, strike, war, accident, act of god, or Our required compliance with any law, regulation, or governmental agency mandate or anything beyond Our reasonable control.

**EXHIBIT C  -  PERFORMANCE GUARANTEE FOR PROVIDER DISCOUNTS**

### Performance Guarantee – Provider Discounts

This guarantee is applies only to the in-network claims and is effective for the period beginning January 1, 2003 and ending on December 31, 2003 ("Guarantee Period").

**Cintas Corporation**
**PPO In-Network Discount Guarantee**

| In Network Discount Guarantee | |
|---|---|
| **Actual 1/1/2003 through 12/31/2003 In Network Discounts** | **% Adjustment to 1/1/2003 through 12/31/2003 ASO Fees** |
| Less than 37.0% | -10.00% |
| 37.0% to 38.0% | -8.00% |
| 38.0% to 39.0% | -6.00% |
| 39.0% to 40.0% | -4.00% |
| 40.0% to 41.0% | -2.00% |
| 41.0% to 47.0% | No Adjustment |

**Assumptions**

- Assumed Number of Employees in PPO Plan          14,197

- Target In-Network Discount Percentage (Illustrative)*      44.0%

- Risk Free Corridor          3%

- Discount savings are calculated as the difference between the covered billed charges (excluding ineligible and not covered charges) submitted by the network provider and the amount based on the negotiated rate with that provider. No reasonable and customary (R&C) reductions are taken when a negotiated rate is in place with a network provider. The calculation is performed before the application of copayments, deductibles, or other coinsurance.

The illustrative Target In-Network Discount Percentage shown above is calculated on an aggregate basis, taking the weighted- average of the in-network discounts based on the market match of Cintas Corporation's total eligible associates.

When the actual PPO enrollment by site has been determined, the final Target In-Network Discount Percentage will be determined as a weighted-average of the discounts and enrolled associates by market.

24

The Table below represents the largest markets, on the basis of eligible associates for Cintas Corporation:

| Site Name | Estimated Employees | In Network Discount |
|---|---|---|
| BASTERN KENTUCKY | 1072 | 44.30% |
| CINCINNATI | 1063 | 44.10% |
| CHICAGO | 896 | 47.60% |
| CLEVELAND | 439 | 46.60% |
| DETROIT | 408 | 37.00% |
| L.A. | 378 | 53.30% |
| ATLANTA | 356 | 49.50% |
| SEATTLE/SPOKANE | 332 | 36.80% |
| HOUSTON | 331 | 51.60% |
| MIAMI | 286 | 52.40% |
| LITTLE ROCK | 272 | 48.60% |
| PHILADELPHIA | 259 | 42.50% |
| WESTERN MICHIGAN | 242 | 31.10% |
| KANSAS CITY | 237 | 50.70% |
| NORTHERN NEW JERSEY | 228 | 54.90% |
| INDIANAPOLIS | 220 | 31.70% |
| BATON ROUGE | 219 | 44.10% |
| BALTIMORE | 209 | 33.50% |
| SAN FRANCISCO | 208 | 48.90% |
| GREENVILLE | 208 | 36.00% |
| COLUMBUS | 206 | 46.50% |
| PITTSBURGH | 200 | 41.10% |
| DAYTON | 192 | 39.90% |
| NORTH CENTRAL ALABAMA | 184 | 50.80% |
| TAMPA | 179 | 50.10% |
| ST. LOUIS | 172 | 49.30% |
| MINNEAPOLIS | 161 | 31.40% |
| DENVER | 159 | 42.80% |
| AUSTIN | 159 | 46.50% |
| ORLANDO | 158 | 52.70% |
| WESTERN KENTUCKY | 156 | 44.90% |
| TULSA | 154 | 37.20% |
| CENTRAL ALABAMA | 153 | 47.90% |
| BOSTON | 149 | 34.30% |
| LONG ISLAND | 142 | 53.10% |
| MILWAUKEE | 141 | 39.40% |
| PORTLAND | 139 | 30.30% |
| PHOENIX | 138 | 58.30% |
| SAN DIEGO | 138 | 44.70% |
| GREENSBORO | 138 | 33.30% |
| SUBURBAN MARYLAND | 134 | 38.50% |
| PALM SPRINGS/RIVERSIDE | 131 | 50.70% |
| CHARLOTTE | 129 | 41.10% |
| CENTRAL INDIANA | 121 | 24.60% |

| | | |
|---|---|---|
| NEW ORLEANS | 119 | 39.80% |
| LAS VEGAS | 116 | 57.10% |
| SAN ANTONIO | 112 | 47.00% |
| BUFFALO/ROCHESTER | 111 | 27.10% |
| RICHMOND | 111 | 43.20% |
| NASHVILLE | 108 | 46.00% |
| | | |
| Other | 1,924 | 42.55% |
| Illustrative Target In-Network Discount Percentage* | 14,197 | 44.00% |

This guarantee is effective during the period of 1/1/2003-1/1/2004 and applies only to the in-network claims. A minimum PPO enrollment of 5,000 employees is required.

*Final Target In-Network Discount Percentage will depend on actual enrollment by network.

## EXHIBIT D  -  THIRD PARTY DISCLOSURE AGREEMENT

### SAMPLE DOCUMENT

This THIRD PARTY DISCLOSURE AGREEMENT ("Agreement") is entered into by and between Cintas Corporation ("Employer"), [Examiner Name] ("Examiner") and United HealthCare Insurance Company for itself and its affiliated companies ("United HealthCare"). These parties acknowledge and agree as follows:

Employer and United HealthCare entered into an agreement ("the Agreement") under which United HealthCare provides claims administration and other services for Employer's employee welfare benefit plan ("Plan"). Employer has retained Examiner to perform an examination, audit or other evaluation of the files, books, and/or records of United HealthCare pertaining to the Plan ("Examination"):

Employer has requested that solely for purposes of the Examination, United HealthCare disclose to Examiner certain documents, statistical information and other information which is commercially valuable, confidential, proprietary, or trade secret ("Proprietary Information") and also materials which may contain medical or other individually identifiable information ("Confidential Medical Information"). Proprietary Information and Confidential Medical Information shall collectively be referred to in this Agreement as "Confidential Information". United HealthCare has agreed to disclose this Confidential Information subject to the terms of this Agreement.

The Examination shall take place on the date or date(s) mutually agreed upon by the parties.

Confidential Information disclosed by United HealthCare, its agents, subsidiaries and affiliates, to Examiner in connection with the Examination, including all copies thereof, shall be used by Examiner only as permitted by this Agreement. Confidential Information shall not include information: (i) generally available to the public or generally known in the insurance industry or employee benefit consulting community prior to or during the time of the Examination through authorized disclosure; (ii) obtained from a third party who is under no obligation to United HealthCare not to disclose such information; or (iii) required to be disclosed by subpoena, or other legal process.

Use: Examiner shall: (a) not use (deemed to include, but not be limited to, using, exploiting, duplicating, recreating, modifying, decompiling, disassembling, reverse engineering, translating, creating derivative works or disclosing Confidential Information to another person or permitting any other person to do so) Confidential Information except for purposes of the Examination; (b) limit use of Confidential Information only to its authorized employees (deemed to include employees as well as individuals who are agents or independent contractors of Examiner) who have a need to know for purposes of the Examination; and (c) may release Confidential Information in response to a subpoena or other legal process to disclose Confidential Information, after giving United HealthCare reasonable prior notice of such disclosure.

At the conclusion of the Examination, Examiner shall either relinquish to United HealthCare, or destroy (with such destruction to be certified to United HealthCare), all Confidential Information. If during the course of the Examination it is discovered that this Agreement has been breached by Examiner then all Confidential Information shall be relinquished to United HealthCare upon demand.

This Agreement binds the parties and their respective successors, assigns, agents, employers, subsidiaries and affiliates.

Unauthorized use of Confidential Information by Examiner is a material breach of this Agreement resulting in irreparable harm to United HealthCare for which the payment of money damages is inadequate. It is agreed that United HealthCare, upon adequate proof of unauthorized use, and in addition to any other remedies at law or in equity that it may have, may immediately obtain injunctive relief in any court of competent jurisdiction enjoining any continuing or further breaches and may obtain entry of judgment for injunctive relief. Examiner consents to said injunctive relief and judgment. Employer and Examiner agree to indemnify and hold harmless United HealthCare with respect to any claims and any damages caused by Examiner's breach of this Agreement.

The requirement to treat all Confidential Medical Information, as Confidential Information shall survive the termination of this Agreement. The requirement to treat all Proprietary Information as Confidential Information under this Agreement shall remain in full force and effect so long as any Proprietary Information remains commercially valuable, confidential, proprietary and/or trade secret, but in no event less than a period of three (3) years from the date of the Examination.

Neither this Agreement nor Examiner's rights or obligations hereunder may be assigned without United HealthCare's prior written approval.

General: (a) This Agreement is the entire understanding between the parties as to the subject matter hereof. (b) No modification to this Agreement shall be binding upon the parties unless evidenced in writing signed by the party against whom enforcement is sought. (c) Headings in this Agreement shall not be used to interpret or construe its provisions. (d) The alleged invalidity of any term shall not affect the validity of any other terms. (d) This Agreement may be executed in counterparts.

The parties have caused their authorized representatives to execute this Agreement.

**Cintas Corporation**

By_____SAMPLE_____
         Authorized Signature

Print Name _____

Print Title _____

Date_____

**[Examiner Name]**

ByBy_____SAMPLE_____
          Authorized Signature

Print Name__:_____

Print Title_____

Date_____

**United HealthCare Insurance Company**

By_____SAMPLE_____
         Authorized Signature

Print Name_____

Print Title_____

Date_____

03738758 (08/02)

Amendment to the Administrative Services Agreement ("Agreement") made by and between United HealthCare Insurance Company ("United HealthCare") and the Contractholder shown below.

**Contractholder: Cintas Corporation**

**Effective Date of Amendment: April 14, 2003**

In this amendment, 'Our, Us, and We' mean United HealthCare Insurance Company. The words may or may not be capitalized.

In this amendment, 'You, Your, and Plan' means Cintas Corporation Welfare Benefit Plan.

The Administrative Services Agreement is amended on the date shown above as follows:

1.    **Section 1 - Definitions** - of the Agreement is amended, to delete the term "Confidential Participant Information" and to add the following terms and definition:

PHI is Protected Health Information, as defined under the privacy regulations issued pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), we receive from or on behalf of Plan.

All references in the Agreement to "Confidential Participant Information" are replaced with PHI.

2.    Section 3.4 of the Agreement is amended as follows:

**Section 3.4 PHI and Proprietary Business Information.** Proprietary Business Information and PHI will be used solely to administer the Plan or to perform under this Agreement. PHI and Proprietary Business Information will not be disclosed to any person or entity other than either party's employees, subcontractors, or representatives needing access to such information to administer the Plan or perform under this Agreement.

(a) Additional Permissible Uses. We may also use PHI for the following:

   (i)       our proper management and administration and to fulfill any present or future legal responsibilities;

   (ii)      disclose the PHI to third parties for the purpose of our proper management and administration or to fulfill any present or future legal responsibilities; provided, however, that the disclosures are required by law or we have received from the third party written assurances that the information will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the third party; and the third party will notify us of any instances of which it becomes aware in which the confidentiality of the information has been breached;

   (iii)     aggregate the PHI as permitted under HIPAA;

   (iv)     de-identify any and all PHI provided that we de-identify the information in accordance with HIPAA. De-identified information does not constitute PHI, is not subject to the terms and conditions of this Section 3.4, may be used by us or a related entity for research, creating comparative databases, statistical analysis, or other studies, and is considered by us to be Proprietary Business Information;

   (v)      use, or disclose to a related entity, PHI for research, as defined under the privacy regulations issued pursuant to HIPAA, including but not limited to projects for therapeutic outcomes research, and for epidemiological studies. We will obtain and maintain, on behalf of Plan, any consents, authorizations or approvals that may be required by applicable federal or state laws and regulations for use or disclosure of PHI for such purposes. We will maintain the confidentiality of such information as it relates to any individual Participant, provider, or your business. The research, databases, analyses, and studies are considered by us to be Proprietary Business Information; and

(vi)          create or use, or disclose to a related entity to create or use, limited data sets as permitted under HIPAA. We also may disclose limited data sets to a related entity, you or your vendors at your direction, provided however, we agree we shall limit use of the limited data sets to research, health care operations or public health purposes and further agree:

(1) Not use or further disclose the limited data sets other than as permitted by this Agreement or as otherwise required by law;

(2) Use appropriate safeguards to prevent use or disclosure of the limited data sets other than as provided for by this Agreement;

(3) Report to you any use or disclosure of the limited data sets not provided for by this Agreement of which we become aware;

(4) Ensure that any agents, including a subcontractor, to whom we provide the limited data sets agrees to the same restrictions and conditions that apply to the limited data set recipient with respect to such information; and

(5) Not identify the limited data sets or contact the individuals.

These limited data sets are considered by us to be Proprietary Business Information.

(b) Our Obligations. We agree that we shall:

(i)      not use or further disclose the PHI other than as permitted by this Agreement or required by law;

(ii)     use appropriate safeguards to prevent use or disclosure of PHI other than as permitted or required by this Agreement;

(iii)    report to Plan any use or disclosure of any PHI of which we become aware that is not permitted by this Agreement;

(iv)    ensure that any subcontractor or agent to whom we provide any PHI agrees to the same restrictions and conditions that apply to us with regard to the use and/or disclosure of PHI pursuant to this section;

(v)     respond to individuals' requests for access to PHI in our possession that constitutes a Designated Record Set in accordance with HIPAA;

(vi)    incorporate any amendments or corrections to the PHI in our possession that constitutes a Designated Record Set in accordance with HIPAA;

(vii)   provide to individuals an accounting of disclosures, in accordance with HIPAA;

(viii)  make our internal practices, books and records relating to the use and disclosure of PHI available to the Secretary of HHS for purposes of determining your compliance with HIPAA ; and

(ix)    except as provided for herein or as required by law, upon termination of this Agreement, return to Plan or destroy the PHI and retain no copies in any form, if feasible. If we determine that returning or destroying the PHI is infeasible, we agree to extend the protections, limitations and restrictions of this section to such PHI and to limit any further uses and/or disclosures of such PHI retained to the purposes that make the return or destruction of the PHI infeasible, for as long as we maintain such PHI.

(c) Plan and Employer-Plan Sponsor Obligations.

(i)      You agree to amend your Plan documents to include specific provisions to restrict the use or disclosure of PHI and to ensure adequate procedural safeguards and accounting mechanisms for such uses or disclosures, in accordance with the HIPAA privacy regulation.

(ii)     Plan agrees, represents and warrants to us that it will (1) obtain any consent or authorization that may be required by applicable federal or state laws and regulations prior to furnishing us the PHI, except as provided for in this section ; and (2) not furnish us any PHI that is subject to any arrangements permitted or required of Plan that may adversely affect our ability to use and/or disclose PHI under this

Agreement, including, but not limited to, restrictions on the use and/or disclosure of PHI as provided for in HIPAA.

3.   Nothing express or implied in this Amendment is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations, or liabilities whatsoever.

4.   All other provisions of the Agreement shall remain in full force and effect.

5.   This Amendment shall be effective on the compliance date applicable to Plan as required under the HIPAA privacy regulation.

| United HealthCare Insurance Company | Cintas Corporation |
|---|---|
| By _____ | By _____ |
|     Authorized Signature |     Authorized Signature |
| Print Name ___Holly Durinick_____ | Print Name ____LARRY FULTZ_____ |
| Print Title _____Contract Acct. Exec._____ | Print Title _____VP, HUMAN RESOURCES____ |
| Date _____4/02/03_____ | Date _____3-28-03_____ |